2022 IL App (1st) 200636-U

No. 1-20-0636

Order filed July 29, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 15234 |
| | ) | |
| TORY McCRAY, | ) | Honorable |
| | ) | Thomas J. Hennelly, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for armed habitual criminal over his contentions that (1) he was denied effective assistance when trial counsel did not pursue a motion to quash arrest and suppress evidence filed by defendant's prior attorney, and (2) he was not proven guilty beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Tory McCray was found guilty of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2018)) and sentenced to eight years in prison. On appeal, defendant contends that he was denied effective assistance when trial counsel failed to

argue a motion to quash arrest and suppress evidence filed by defendant's prior attorney, and that he was not proven guilty beyond a reasonable doubt. We affirm.

¶ 3    Defendant was charged by indictment with AHC, unlawful use or possession of a weapon by a felon, and aggravated unlawful use of a weapon (AUUW) following an incident in Chicago on September 26, 2018.

¶ 4    On May 28, 2019, defendant's assistant public defender (APD) filed a motion to quash arrest and suppress evidence alleging that at the time of defendant's arrest, officers could not reasonably interpret his conduct as providing sufficient probable cause that he committed or was about to commit a crime. Moreover, the entry and search of the residence where defendant was arrested was warrantless and unreasonable, requiring suppression of the firearm recovered therein. At some point, the attorney who filed the motion was replaced by a different APD (trial counsel).

¶ 5    On July 29, 2019, trial counsel told the court that the investigation was "outstanding" and acknowledged the pending motion to quash arrest and suppress evidence. On September 25, 2019, trial counsel asked that the motion be set for a later date because certain witnesses were not present. On November 4, 2019, trial counsel again stated that a witness was not present and asked to reset the motion. The trial court instructed counsel to subpoena the witness and continued the case.

¶ 6    The report of proceedings for the next hearing date reflects that trial counsel was not present, and an unidentified defense witness stated that she "should be able to" attend court on November 26, 2019. On November 26, 2019, the trial court continued the cause until December 12, 2019, for a hearing "on the motion." However, on December 12, 2019, the State told the court there was "confusion" about the date, trial counsel had appeared on a different date, and a new

"[h]earing date" was selected for a bench trial. On January 14, 2020, a different APD appeared in place of trial counsel and asked that the case be set for a bench trial.

¶ 7    On January 23, 2020, a bench trial commenced with trial counsel again representing defendant. The State proceeded solely on the AHC charge. Trial counsel informed the court that witness Cassandra Walton, who was under subpoena, was not present.[1]

¶ 8    Chicago police officer Robert Caulfield testified that around 12:47 p.m. on September 26, 2018, he and other uniformed officers were in an unmarked SUV. Caulfield, who was in the front passenger seat, observed defendant and another man, later identified as Darkmon Walton, in front of a house in the 1300 block of West 108th Place. From 10 to 15 feet away, defendant made eye contact with Caulfield and then used both hands to adjust his waistband.

¶ 9    The SUV stopped and the officers exited. Defendant "jog[ged]" toward the residence and through a gate, ignoring orders to stop. From 8 to 10 feet away, Caulfield observed defendant use his left hand to remove a black semiautomatic weapon from his waistband. The firearm was five inches by five inches. Then, defendant opened the front door, entered the house, and closed the door after him. The officers were unable to reopen the door, so they surrounded the house to see whether defendant exited or threw the firearm from a window.

¶ 10    The officers then tried to enter the house through a side door, which was also locked, so they knocked. Two to three minutes later, Cassandra opened the side door. Officers explained that a person with a firearm entered the house and asked if she knew the person or saw him. Cassandra allowed the officers to enter. Defendant, who was on a couch in the living room, was detained. Caulfield conducted a "sweep" of the house. From the floor of an upstairs bedroom, Caulfield

---

[1] For clarity, we will refer to each member of the Walton family by his or her first name.

recovered "the firearm that the defendant had," a .22-caliber semiautomatic made of "blue steel" that looked black. Caulfield spoke to Jackie Walton, the homeowner, in another upstairs bedroom and told her that someone entered the home with an "illegal firearm."[2] Another officer showed Jackie a complaint form for trespass to a residence, which she signed. The firearm was inventoried and sent for forensics testing and fingerprint analysis.

¶ 11     During cross-examination, Caulfield acknowledged that he did not observe defendant and Darkmon commit a crime. Caulfield's attention was drawn to defendant when he made movements to his waistband. Defendant jogged away and Darkmon did not move. After defendant entered the gate, Caulfield observed the firearm.

¶ 12     Caulfield did not know whether Darkmon lived at the house and did not remember how Cassandra and Jackie were related to Darkmon. Caulfield believed that when Cassandra was asked if she saw someone enter the residence, she said no and allowed officers to enter the residence. He did not remember Cassandra's response when he told her that someone entered the residence with a firearm; however, Cassandra did not identify anyone in her living room as a "strange man." Caulfield believed that Cassandra indicated that defendant did not belong in the home, but agreed that no such statement was in his report.

¶ 13     Caulfield did not obtain Cassandra's consent to search the bedrooms and did not ask if defendant entered other rooms of the house. The firearm was recovered from a bedroom containing an inflatable mattress and television. Caulfield believed that defendant was brought before Jackie,

---

[2] The complaint was admitted into evidence and is included in the record on appeal. It shows the signature "Jackie Walton."

who was bedridden and indicated that she did not know him. No firearms were recovered from defendant, who did not live at the address. He did not attempt to flee.

¶ 14 The State entered certified copies of defendant's convictions for residential burglary in case number 14 CR 0885901 and burglary in case number 10 CR 2127901, and rested. The cause was continued so that Cassandra could attend court.

¶ 15 At the next date, trial counsel told the court that Cassandra, who was "under subpoena before," was not present, but that defendant wanted to proceed. Defendant told the court that Cassandra completed an affidavit. The court responded that witnesses needed to testify under oath, and passed the case so that defendant and trial counsel could confer. When court reconvened, trial counsel stated that defendant wished to procced. The trial court stated that it was "happy" to set a date for the defense to bring the witness, but the decision rested with counsel and defendant. Trial counsel stated that he explained the consequence of not having Cassandra testify and that defendant wished to proceed without her. Defendant affirmed that he wanted to proceed without her.

¶ 16 Defendant testified that at the time of his arrest, he lived in the 400 block of West 100th Street. Defendant and Darkmon attended school together. Shortly after noon on September 26, 2018, they were inside the fence in Darkmon's yard when four officers exited a vehicle. Three officers were uniformed. Although the officers questioned them, Darkmon closed the gate and stated the officers had no reason to approach his grandmother's home. Darkmon told defendant to get Darkmon's mother, so defendant went inside the house and called for Jackie. He did not lock the door. Cassandra, Jackie's sister, asked what was happening, and defendant stated that the police

were outside with Darkmon.[3] While defendant was sitting in the living room, the police forced open the backdoor, knocked over Cassandra, and searched the home. Defendant denied having a firearm. The police did not tell him a firearm was recovered, but said he was charged with criminal trespass to a residence.

¶ 17    During cross-examination, defendant denied being on the sidewalk; rather, he was in the fenced yard. Jackie, whom defendant stated was Darkmon's mother, was not present. Darkmon's grandmother, a double-amputee, owned the home. As the officers entered, Caulfield "shoved" Cassandra to the ground and searched the upstairs bedroom.

¶ 18    In closing argument, the defense argued that Caulfield acknowledged that defendant and Darkmon were not committing any crimes when Caulfield observed them, and that once allowed inside, the officers searched the house without consent. Defendant was nowhere near the recovered firearm and did not live at the address. According to trial counsel, Caulfield's testimony that defendant ran into a home where he was unknown, hid a firearm, and then "calmly" sat in the living room was illogical. The State argued that Jackie was present because she signed the complaint, and that Caulfield testified credibly and established that defendant entered the house, locked the door, and hid the firearm.

¶ 19    In finding defendant guilty of AHC, the court noted that the case turned on whether the court believed Caulfield's or defendant's version of events. The court found the testimony of Caulfield, a "veteran police officer," to be unimpeached and uncontradicted, and that the testimony of defendant, a "two-time convicted felon," was self-serving. Moreover, "logic" dictated that Caulfield's version of events occurred.

---

[3] Defendant also refers to Cassandra Walton as Christina Walton.

¶ 20    Defendant filed a motion for a new trial, which the court denied. After argument, the trial court imposed an eight-year prison term for AHC. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 21    On appeal, defendant first contends that he was denied effective assistance when trial counsel failed to pursue the motion to quash arrest and suppress evidence filed by defendant's prior attorney.

¶ 22    When evaluating a claim of ineffective assistance, we apply a two-prong test under which the defendant must prove his counsel's performance fell below an objectively reasonable standard and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Acts or omissions by counsel will not be considered matters of strategy, however, where no sound tactical reason could conceivably support the act or omission. *People v. Nunez*, 263 Ill. App. 3d 740, 748 (1994).

¶ 23    The decision to file a motion to suppress is generally a matter of trial strategy entitled to great deference. *People v. Gayden*, 2020 IL 123505, ¶ 28. To establish ineffective assistance based on counsel's failure to file such a motion, a defendant must show that the unargued motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *Id.* It is the defendant's burden to establish a factual basis for an ineffective assistance claim, *i.e.*, that an unargued suppression motion would have been meritorious. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 16.

¶ 24    Where the record does not contain sufficient information concerning the circumstances of the defendant's arrest to determine whether a motion to suppress would have been meritorious or whether the defendant was prejudiced by counsel's failure to file it, we cannot consider the claim. *Gayden*, 2020 IL 123505, ¶ 29. "[T]he record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose." *People v. Henderson*, 2013 IL 114040, ¶ 22; see also *Gayden*, 2020 IL 123505, ¶ 30 (finding the record was fully developed regarding "the specific charge against [the] defendant," but not "with regard to the circumstances leading up to and surrounding [his] arrest").

¶ 25    "As the United States Supreme Court has observed, a reviewing court often cannot entertain a claim of ineffective assistance of counsel on direct review when the claimed error was not a focus in the case below." *Burnett*, 2019 IL App (1st) 163018, ¶ 11 (citing *Massaro v. United States*, 538 U.S. 500, 504-05 (2003)). Thus, some claims of ineffective assistance of counsel must be pursued under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), where a factual record to support the claim may be developed. *People v. Veach*, 2017 IL 120649, ¶¶ 46-48; see also *People v. Erickson*, 161 Ill. 2d 82, 87-88 (1994) (ineffective assistance claims based on what counsel ought to have done may depend on matters *de hors* the record; such claims are not subject to procedural default under the Act).

¶ 26    Here, defendant argues that the motion to quash arrest and suppress evidence would have been successful, as he was not committing a crime when officers attempted to stop him and "carrying a firearm no longer automatically constitutes criminal conduct" due to *People v. Aguilar*, 2013 IL 112116.

¶ 27    An arrest made without probable cause violates the prohibitions against unreasonable searches and seizures under the United States and Illinois constitutions. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001).

¶ 28    Pursuant to *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), a police officer may briefly detain a person for investigatory purposes if the officer reasonably suspects the person has committed or is about to commit a crime. *Thomas*, 198 Ill. 2d at 108-09; see also 725 ILCS 5/107-14(a) (West 2018) (an officer "having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense"). Reasonable suspicion is based on the totality of the circumstances, commonsense judgments, and inferences about human behavior. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Officers may rely on their training and experience and make inferences that would elude the untrained person. *People v. Leighty*, 362 Ill. App. 3d 258, 261 (2005). Reasonable suspicion is a "low bar." *People v. Patel*, 2020 IL App (4th) 190917, ¶ 25.

¶ 29    A police officer has probable cause to arrest an individual when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the individual has committed a crime. *People v. Grant*, 2013 IL 112734, ¶ 11. The determination of probable cause focuses on the facts known to the officer at the time of the arrest. *Lee*, 214 Ill. 2d at 484. "A warrantless arrest cannot be justified by what is found during a subsequent search incident to arrest." *Id*. A court does not concern itself with an officer's subjective belief as to probable cause; rather, we apply an objective analysis. *Id*. "The standard for determining whether

probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.* at 485. We examine the totality of the circumstances to determine whether there is probable cause to believe a defendant committed a crime and, therefore, was subject to arrest. *Id*.

¶ 30    In this case, the record lacks sufficient information about defendant's arrest for us to determine whether the suppression motion would have prevailed had it been argued. Because the motion was unargued and the case proceeded to a bench trial, the State only sought to prove that defendant committed the charged offense, and had no reason to demonstrate a "factual basis" which established reasonable suspicion or probable cause. *Burnett*, 2019 IL App (1st) 163018, ¶ 11.

¶ 31    In reaching this conclusion, we are mindful that our supreme court has cautioned against categorically determining that all ineffective assistance claims are better suited to collateral review. *Veach*, 2017 IL 120649, ¶¶ 46-48. Rather, we should "carefully consider each ineffective assistance of counsel claim on a case-by-case basis" to determine if the circumstances permit us to adequately address a defendant's claim on direct review before deferring consideration of the claim to collateral review. *Id*. ¶ 48.

¶ 32    After carefully reviewing the record on appeal, we cannot consider defendant's claim of ineffectiveness because the record was not developed to establish the existence or absence of reasonable suspicion or probable cause. Numerous factual questions preclude us from deciding the substantive fourth amendment claims that underlie defendant's claim of ineffective assistance of counsel. See *Henderson*, 2013 IL 114040, ¶ 15 (holding that part of finding counsel ineffective requires determining the merits of the unfiled motion to suppress).

¶ 33     Specifically, the record does not explain the officers' presence on the street or the details of the interactions between Caulfield, his partners, and defendant. Defendant relies on *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 67, to argue that "running from the police is not even sufficient to establish *reasonable suspicion* unless other circumstances indicate suspicious or illegal behavior" (emphasis in original), and asserts that "no evidence" established that Caulfield possessed "any additional information" such as a tip regarding a crime at that address or that the address was located in a high-crime area.

¶ 34     At trial, however, Caulfield was not questioned as to the character of the neighborhood or the reason for the officers' presence; indeed, that information was not relevant to the AHC charge. See *Gayden*, 2020 IL 123505, ¶ 32 (the State had "no reason to establish the factual basis that gave the officers probable cause to arrest [the] defendant in the first place, as that information was not necessary to prove" the charged offense). Similarly, although no evidence addressed whether defendant possessed a Firearm Owners Identification (FOID) card or was legally permitted to carry a firearm, these facts were also irrelevant to the AHC charge. Absent such details, we cannot determine the basis for a reasonable suspicion or probable cause determination, and accordingly whether trial counsel was ineffective for failing to pursue the motion to quash arrest and suppress evidence. See *Burnett*, 2019 IL App (1st) 163018, ¶ 12.

¶ 35     *Burnett* is instructive. There, the defendant was a passenger in a van that was curbed after officers noticed it lacked a front license plate. *Id.* ¶ 3. During the stop, an officer observed the defendant place an object in the vacant third row of seats. *Id.* ¶ 4. When the van's driver could not produce a driver's license, all occupants were ordered from the van. *Id.* The object, a semiautomatic handgun, was then recovered from the van and the defendant was arrested. *Id.* The

defendant lacked a valid FOID card or concealed carry license, so he was charged with, in pertinent part, AUUW. *Id.* ¶ 5. There was no indication that the officers knew that the defendant had a felony record or that he lacked a FOID card and concealed carry license before arresting him. *Id.* The defendant was ultimately convicted of AUUW and sentenced to 4½ years in prison. *Id.* ¶ 6.

¶ 36    On appeal, the defendant contended that he was denied effective assistance when trial counsel failed to file a motion to quash arrest because the mere possession of a firearm was no longer sufficient to establish probable cause to justify an arrest. *Id.* ¶ 7.

¶ 37    We found that the record lacked sufficient information about the circumstances of the defendant's arrest from which we could determine whether he was prejudiced by counsel not filing a motion to quash arrest. *Id.* ¶ 11. Because the case went to trial without the defendant seeking to first quash his arrest, the State only sought to prove that the defendant committed the charged offenses and had "no reason" to establish the factual basis that gave the officers probable cause to arrest him. *Id.*

¶ 38    We also rejected the defendant's argument that there was no evidence that prior to his arrest the officers had probable cause to believe that he lacked a FOID card or a concealed carry license. *Id.* ¶ 14. As we explained, the defendant attempted "to spin the lack of testimony about probable cause into a conclusion that *there was* no probable cause," and had drawn "an affirmative conclusion from a negative premise." (Emphasis in original.) *Id.*

¶ 39    Similarly, here, although defendant is correct that Caulfield did not testify whether defendant and Darkmon were known to officers, whether the officers were responding to a tip regarding criminal activity, and whether defendant was asked prior to his arrest whether he possessed a FOID card or was legally permitted to carry a firearm, this information was not

germane to the AHC charge. As Caulfield, the only officer to testify, was not questioned regarding the officers' presence on the street or other observations they may have made at the time, we cannot know the facts they considered in arriving at a reasonable suspicion or probable cause determination.

¶ 40     We similarly reject defendant's argument that because the record before this court does not clearly establish reasonable suspicion and probable cause, neither existed. See *Gayden*, 2020 IL 123505, ¶ 33 ("The lack of evidence currently in the record, however, does not establish as fact that there was no evidence to support a probable cause or exigent circumstances determination."). Rather, as in *Burnett*, the lack of evidence currently in the record concerning reasonable suspicion and probable cause does not mean no evidence existed to support such determinations or that defendant's arrest was unjustified. *Burnett*, 2019 IL App (1st) 163018, ¶ 14 ("The lack of evidence *currently in the record* concerning probable cause and the officers' pre-arrest beliefs cannot be equated with fact—that there was *no evidence* to support a probable cause determination." (emphasis in original)); see also *Gayden*, 2020 IL 123505, ¶¶ 30, 33 (while the facts relating to the specific charge against defendant were developed at trial, "this is not true with regard to the circumstances leading up to and surrounding" his arrest because those events were not at issue and the State did not have to establish "justification" for the arrest).

¶ 41     We are unpersuaded by defendant's reliance on *People v. Bloxton*, 2020 IL App (1st) 181216, and *People v. McClendon*, 2022 IL App (1st) 163406.

¶ 42     In *Bloxton*, the defendant was charged with unlawful possession of a weapon by a felon and possession of a weapon with a defaced serial number. *Bloxton*, 2020 IL App (1st) 181216, ¶ 4. Trial counsel filed a motion to quash arrest and suppress evidence alleging that the firearm was

obtained from an illegal search when the defendant was not involved in any criminal activity and officers had no reasonable suspicion that he was armed or dangerous. *Id.* The trial court held the hearing on the motion simultaneously with the defendant's bench trial. *Id*. In denying the motion, the trial court found that the defendant was not seized until he drew the firearm, at which point it was in plain view and the officer had probable cause to arrest him. *Id*. ¶ 9. The court further found the defendant guilty of unlawful use of a weapon by a felon and possession of a weapon with a defaced serial number. *Id*. ¶ 10. On appeal, the defendant contended he was denied effective assistance when trial counsel failed to argue that the police lacked probable cause to arrest him based solely on his possession of a firearm when officers did not know, at that time, whether he was legally permitted to carry it. *Id*. ¶ 12. We reversed, finding no probable cause based on the facts known to officers at the time of the defendant's arrest. *Id*. ¶ 20.

¶ 43    Similarly, in *McClendon*, the defendant's attorney filed a motion to suppress evidence of a firearm, which the trial court denied after a hearing. *McClendon*, 2022 IL App (1st) 163406, ¶ 5. On appeal, the defendant argued that trial counsel provided ineffective assistance by failing to argue that the firearm and any statements about it constituted fruits of an illegal seizure. *Id.* ¶ 13. This court reversed. *Id.* ¶ 33.

¶ 44    In both *Bloxton* and *McClendon*, the issue before this court was whether the defendant was denied effective assistance by trial counsel's failure to make certain arguments in support of the motion, rather than, as here, whether counsel failed by not arguing the motion at all. Further, in both *Bloxton* and *McClendon*, unlike the case at bar, the trial court heard the motions to quash arrest and suppress evidence and the records were fully developed as to the circumstances of the

arrests and the charged offenses. Here, because the motion was not argued, the record does not establish the detailed circumstances of the arrest.

¶ 45 Finally, we are unpersuaded by defendant's reliance on *People v. Horton*, 2017 IL App (1st) 142019, *vacated*, 2017 IL 122461 (supervisory order), and *People v. Thomas*, 2016 IL App (1st) 141040, *vacated*, 2017 IL 121947 (supervisory order). As defendant concedes, these decisions were vacated by our supreme court and ordered to be reconsidered in light of *People v. Holmes*, 2017 IL 120407.[4] Judgments vacated by the supreme court are void and have no effect. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 116.

¶ 46 We therefore decline to address defendant's ineffective assistance claim because the record, as it exists, is insufficient for us to determine whether trial counsel's decision not to pursue the motion to quash arrest and suppress evidence filed by prior counsel was strategic, or whether such a motion would likely have succeeded. *Veach*, 2017 IL 120649, ¶ 46. Accordingly, on this record, defendant is unable to overcome the strong presumption that his attorney's failure to pursue the motion reflected sound trial strategy, and his claim of ineffective assistance fails. See *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 38.

¶ 47 Defendant next contends that his AHC conviction should be reversed when no firearm was recovered from his person and he did not live at the residence where the firearm was recovered.

---

[4] Upon reconsideration, this court again found that the trial court erred in denying the defendant's motion to quash arrest and suppress evidence in *People v. Horton*, 2019 IL App (1st) 142019-B, ¶¶ 5, 54-76, but held that the trial court properly denied the defendant's motion to quash arrest and suppress evidence in *People v. Thomas*, 2018 IL App (1st) 141040-U, ¶¶ 23-41. In both cases, the issue before this court was whether the trial court erred in denying the defendant's motion rather than, as in this case, trial counsel's alleged ineffectiveness for failing to pursue the motion.

¶ 48     When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction is reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 49     To convict defendant of AHC, the State must prove, in pertinent part, that he possessed a firearm after being convicted of two or more enumerated offenses. See 720 ILCS 5/24-1.7(a) (West 2018). On appeal, defendant challenges only the sufficiency of the evidence proving his possession of a firearm.

¶ 50     To prove the possession element, the State can show either actual or constructive possession of a firearm. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Actual possession is shown by testimony that a defendant had some form of control over the firearm, "such as he had it on his person, tried to conceal it, or was seen to discard it." *Id*.

¶ 51     Viewed in the light most favorable to the State, there was sufficient evidence from which the trial court could have found defendant possessed a firearm. Caulfield testified that after he made eye contact with defendant, defendant used both hands to adjust his waistband and jogged to the residence. Before defendant entered the building, defendant used his left hand to remove a

black semiautomatic weapon from his waistband. This testimony supports a finding that defendant actually possessed a firearm. See *id.* ¶ 28 (finding the credible testimony of a police officer that showed defendant had actual possession of a firearm was sufficient to prove possession). Although defendant notes that the State did not produce the weapon, which Caulfield stated he recovered inside the building, photographs of it, or the results of any forensic testing, such evidence was unnecessary for the State to prove that defendant possessed the firearm. See *People v. Moore*, 2016 IL App (1st) 133814, ¶56 (because a single credible witness is sufficient to sustain conviction, the State need not present corroborating physical evidence); *People v. Bennett*, 154 Ill. App. 3d 469, 475 (1987) (lack of fingerprint evidence does not necessarily raise a reasonable doubt of guilt; rather, it is "unnecessary and cumulative" when there is eyewitness testimony).

¶ 52　Defendant challenges the trial court's credibility determinations, noting that the trial court characterized him as a "two-time convicted felon" whose testimony was self-serving, while affording greater weight to the testimony of a police officer. Defendant argues that Caulfield's statement to Jackie that an individual entered the home with an "illegal firearm" shows that he was "operating on his own assumptions," Caulfield's profession does not render him inherently more credible, and that it defies logic that a person would remove a firearm from his trousers while in the view of police officers. Defendant likens Caulfield's account to so-called "dropsy" testimony, where an officer is alleged to have fabricated evidence that a defendant dropped contraband in plain view in order to avoid the exclusion of improperly obtained evidence. See, *e.g.*, *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 20.

¶ 53　The testimony of a single witness, if positive and credible, is sufficient to uphold a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Contradictory evidence, or

minor or collateral discrepancies in testimony, does not automatically render the totality of a witness's testimony incredible. *People v. Gray*, 2017 IL 120958, ¶ 47; *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. That is true whether the factfinder is considering contradictions or discrepancies within the testimony of a single witness (*Gray*, 2017 IL 120958, ¶ 47), or, as here, comparing one person's account to that of another (*Peoples*, 2015 IL App (1st) 121717, ¶ 67).

¶ 54    Here, Caulfield observed defendant adjust his waistband and draw a firearm prior to entering the residence, and recovered the same firearm from inside the residence. Although defendant denied possessing a firearm, the trial court found Caulfield's testimony credible. The trial court was not "required to accept the defendant's version of the facts." See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53.

¶ 55    A rational trier of fact could have found Caulfield's testimony was neither improbable nor contrary to human experience. Defendant's allegation that police officers frequently fabricate "dropsy" testimony does not show that the evidence in this case, *i.e.*, that defendant drew a firearm prior to entering the residence, shut the door, discarded the firearm in an upstairs bedroom, and then remained in the living room, was so improbable or incredible that it created a reasonable doubt of his guilt. See *Campbell*, 2019 IL App (1st) 161640, ¶ 34 (noting that "we do not always see logical responses to police presence from criminal suspects"); see also *People v. Henderson*, 33 Ill. 2d 225, 229 (1965) ("Far from being contrary to human experience, cases which have come to this court show it to be a common behavior pattern for individuals [possessing contraband] to attempt to dispose of [it] when suddenly confronted by authorities.").

¶ 56    Considering the two versions of events presented, the trial court did not find defendant's version credible. See *People v. Bradford*, 2016 IL 118674, ¶ 12 ("It is the responsibility of the trier

of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts."). Here, the trial court found the testimony that defendant possessed a firearm to be credible and rejected the testimony to the contrary. This court will not retry a defendant and overturn the trial court's credibility determinations simply because a defendant claims his version of events is more credible. See *Peoples*, 2015 IL App (1st) 121717, ¶ 67 (the mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction).

¶ 57 Accordingly, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have concluded that defendant possessed a firearm. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Defendant's conviction for AHC is therefore affirmed.

¶ 58 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59 Affirmed.